Opinion delivered June 6, 1888.

## No. 5810.

## DOCK MARTIN v. THE STATE

1. PRACTICE—EXCEPTION—CHARGE OF THE COURT.—To perpetuate an exception to a charge of the court, the defendant must give notice of exception at the time that the charge is delivered, but he need not specify the ground of exception until the jury has retired. He must do so, however, before the return of verdict; otherwise this court will revise only fundamental error.

2. SAME.—Special charges are properly refused when, so far as they are correct, they were substantially embodied in the general charge.

3. WILFULLY PERMITTING THE ESCAPE OF A PRISONER—DECLARATIONS of an accomplice, made pending the commission of the offense, and in the absence of the accused are not admissible in evidence against the latter, in the absence of evidence of a conspiracy between the two to commit the offense.

4. SAME.—Declarations of an accomplice made in the absence of the accused and *after* the consummation of the offense, are not admissible against the accused.

APPEAL from the District Court of Wise, on change of venue from Denton. Tried below before the Hon. George A. McCall.

The indictment in this case charged that the appellant, as a guard of the Denton county jail, on the third day of February, 1885, wilfully permitted the escape of one B. F. Paschall, a prisoner then confined in the said jail on the charge of murder. His trial resulted in conviction, and his punishment was assessed at a term of two years in the penitentiary.

The State introduced as its first evidence the indictment charging B. F. Paschall with the murder of R. Owens, in Denton county, Texas, on the thirteenth day of January, 1885, and the capias on which the said Paschall was arrested. It then called to the stand Mr. C. F. McDonald, who testified that he was sheriff of Denton county in February, 1885, and on the third day of that month had custody of one B. F. Paschall, by virtue of the capias in evidence. Tom Lester was jailer when Paschall was placed in jail, but witness, at the suggestion of County Judge Bradley, employed three persons to help guard the jail. He hired one Freeman upon the recommendation of Bradley, and one Witcher and one Kelso without recommendation. Lester soon resigned as jailer, but witness did not appoint anybody in his place. Kelso soon afterward quit on the plea of ill health, and upon the recommendation of Freeman witness employed the defendant. Defendant became a guard at the jail about a week before the escape of Paschall. When Lester resigned the witness gave the jail keys to Freeman, but Freeman soon returned them to witness upon the plea that he did not want to incur the responsibility of keeping them. Witness then gave them to Witcher, and Witcher had them at the time of Paschall's escape. The jail of Denton county was a three room brick building, of which the following is a correct plot, "D" representing doors and "W" windows:

Statement of the case.

The building fronts west, and the entrance at that point opens into a hallway. The hall is flanked on the south by the witness's bed room, and on the north by the kitchen. The east door of the hall led to the jail room. The door leading into the jail room was a large iron door. In the door was a wicket about a foot square, crossed with iron bars. The wicket was usually left open. The jail room was about twenty by twenty-four feet in size, the other rooms being considerably smaller. There were two windows on the east, two on the north and two on the south sides of the jail room. The entire building was surrounded by a high, closely built plank fence, in which there was but one opening—the gate on the west side, which led to the main entrance of the building. The jail room contained two ten foot square cells, which were joined together, and stood in the middle of the jail room. They were constructed of solid iron, and opened to the south into a corridor of iron lattice work. The door leading into the corridor was at the southwest corner, and was the only means of egress from or ingress to the cells or the corridor. There was a cell in the northwest corner of the jail room (marked "A" on the plat), which was used for the confinement of lunatics and female prisoners. It was made of open lattice wood work, and was about ten feet square, although it appears oblong on the plat. The door to this cell opened to the south. That and the corridor door were not more than three or four feet apart. This cell, at the time of the escape of Paschall, was used by the guards as a sleeping place. The guards remained in the jail room day and night.

Paschall made his escape from the Denton county jail on the night of February 3, 1885. The trial of Paschall was set for the fifth day of the same month. Several days before the escape of Paschall, the witness sent a deputy of his named Ball to Austin, with a lunatic. Ball was taken sick at Alvarado, in Johnson county, on his way back, and wrote witness to that effect. Ball was an important witness in the Paschall case, and on the evening of February 3, 1885, the witness showed to the district attorney the letter from Ball reporting his illness at Alvarado. The district attorney spoke to the district judge about it, who said that Ball must be brought to Denton to attend the Paschall trial, and ordered the issue of an attachment for him. Witness reported to the judge that all of his deputies were absent, and that he would have to go himself. The judge replied that Ball must be produced on the trial. Witness thereupon spoke to

Silas Crystal, one of his deputies, who lived about twelve miles from town, about staying at the jail on that night. Crystal was in town in a wagon with his aunt. He said that he would have to take his aunt home, but would try to get back by dark. Shortly before he left to go to Alvarado the witness met another of his deputies; named Ware, who promised to stay at the jail that night. But about the time witness left, Ware reported that he had ust learned of the illness of his child, and that he could not stay. Witness and his guards, the defendant among the number, ate supper together at the jail on that night. Witness told his guards that he had to go to Alvarado, but that Crystal would be at the jail to watch with them that night. Freeman replied that he did not know Crystal. Witness told him that he would know him by his cripple leg. Witness then left for Alvarado. He reached Fort Worth about on time, but was compelled to remain in that city until about nine o'clock on the next day. He went to Alvarado, got Bell and reached Denton about midnight on February 4.

On reaching the jail, on the said night of February 4, he found one Bob Huffman in charge of the prisoners, and the escape of Paschall was reported to him. On the next morning he examined the jail and found the corridor and cells intact, but the south one of the east windows had been broken open. That window had been originally secured by an iron slat blind which reached entirely across, and was fastened about the middle of the wall. That blind resembled ordinary wood shutters, except that the iron slats reached entirely across the window, and the whole was stationary and fastened to the wall on each side of the window. Three or four of the iron slats which formed that blind were broken out during the preceding fall, making a hole large enough to admit the passage of the body of a man. That place was repaired in December, 1884, by W. J. Lacey, a blacksmith of Denton. Lacey repaired the said place by fastening three large iron bars, about the size of wagon tires, across the broken place in the window. The said bars were placed on the outside of the window, and were fastened by means of bolts passing through the ends of the bars on the outside and through the brick wall to the inside, and then tapped with nuts and bradded to prevent the removal of the nuts. Glass shutters, meeting in the middle like a folding door, were hung on the inside of the window. Those shutters, when closed, were very near the inside of the window facing. There was a broken pane at the lower

36

part of the sash on the south side of the window, just over the broken place in the blind. About the time that Paschall was placed in jail, the witness and Lester nailed a piece of tin or sheet iron over the lower part of the window. The bolts of the outside bars came through to the inside about five inches from the window facing. The taps were on the bolts and the bars were in their places when witness examined them on the morning of February 5, but witness could see that the taps had been removed and replaced. The piece of tin or sheet iron had been knocked or pushed from all its fastenings, except the lower nail on the north side, from which it was hanging.

Cross examined, the witness said that, when speaking to Crystal and Ware about staying at the jail, he did not ask either of them to go to Alvarado after Ball. He had no recollection of telling Judge Bradley, a few days before Paschall's escape, that he did not fear Paschall's escape, and that he did not think Paschall would leave if turned out. On reaching Fort Worth, the witness had a conversation with Deputy Sheriff Maddox, in which he told Maddox that he would not be surprised if an attempt was made at any time to release Paschall from jail. On his way to take the train for Alvarado, witness crossed the public square of Denton, but had no recollection of stopping in at Paschall's bar room. He met Judge Carroll near the bank, and was asked by him where he was going. As witness did not want his real business known to anybody, he told Judge Carroll that he was going to Fort Worth after Major Johnson. A few days before the witness went to Alvarado after Ball, Judge Carroll came to the jail to see Paschall and had him to sign a paper, which the witness, at Judge Carroll's request, attested with his signature. The witness understood at the time that that paper related to a transaction about stock in the Denton Exchange Bank, which stock Paschall then owned. It was while witness was eating supper that Ware came to him and told him that his child was sick, and that he could not guard the jail on that night. Witness afterwards learned that Ware's child was not sick. Witness, on two occasions, a few days before the escape of Paschall, went into the cell and had private conversations with Paschall. The first lasted about ten minutes, and the second a few minutes longer. He made no effort to keep the guards from seeing him, but took care that his talk with Paschall was not overheard. Paschall was the sole occupant of that cell. Five felony prisoners (three of whom were

then under conviction) occupied the other cell. The five prisoners were locked together in their cell, and Paschall was allowed free access, night and day, to both his cell and the corridor. Paschall, who was a saloon keeper, said when arrested that he was a whisky drinker, and witness gave orders that Paschall be allowed to have what he wanted. Witness also permitted Paschall to receive his friends whenever they called to see him, and they called often. The corridor door was secured by three locks, and the cells were secured by a lever which worked at the corridor door. The guards divided their hours of watch to suit themselves. It was witness's understanding that defendant and Freeman had the first hours of the night as their watch, and Witcher the last hours. Witness allowed no other prisoner than Paschall the freedom of the corridor at night.

On his redirect examination, the witness said that he joined the Masonic order a short time before the escape of Paschall. The lodge failed to appoint any person to lecture witness, and witness spoke to W. J. Lacy about such omission. Lacy replied that Ben Paschall, then confined in jail, was the very best man in the order to lecture and instruct a person, and advised witness, if he had full access to Paschall, to get instruction from him. The two visits paid by witness to Paschall in jail, as stated on cross examination, were about Masonic instruction, and nothing else was talked about by either the witness or the prisoner during those visits. Witness knew nothing whatever about a scheme to release Paschall from jail.

Robert Huffman was the next witness for the State. He testified that, on the morning after the escape of Ben Paschall, he was requested by the county judge to take possession of, and control the county jail of Denton county, until the return of Sheriff McDonald. He took possession about nine o'clock on the morning of February 4, 1885, at which time he found five prisoners in confinement, occupying the front cell. The corridor was locked. The south east window of the jail room was open, and a large piece of tin or sheet iron, which witness did not observe closely, was hanging down from the side window. The two lower iron bars on the outside had been released from their inside fastenings on the south side, and were hanging down from their north fastenings. The south ends had been released by the removal of the inside taps and the withdrawal of the iron bolts. The taps were found on the window sill. The taps had

been forced over the brads. Witness replaced the bars, bolts and taps, the latter with some difficulty.

Mrs. Bettie McDonald, the wife of the witness C. F. McDonald, was the next witness for the State. She testified that she and her family lived at the jail in February, 1885, and occupied the front part of the jail building, the room south of the hall as a bed room and the room north of the hall as a kitchen and dining room. The defendant and Freeman and Bart Witcher were the jail guards at the time of Paschall's escape from jail. Sheriff McDonald ate supper with witness and the said three guards about six o'clock on the evening of February 3, 1885, and the witness heard the said sheriff tell the said guards that he was going off that night, and that Ware and Crystal would be there to help guard the jail. He admonished the guards to use extra care in guarding the jail. Ware came into the kitchen during supper and reported that his child was sick and that he could not go on duty. Sheriff McDonald left about seven o'clock. About dusk (which was after McDonald left) Freeman passed out of the jail room, through the front door and out at the gate, and went toward the public square—a thing so unusual for a guard to do that witness watched him as long as she could see him. After an absence of about twenty minutes Freeman came back and went into the jail room. A short time afterward defendant and Freeman left the jail room together, and passing out at the east door of the kitchen, went into the yard together, where they remained for fifteen or twenty minutes. They took no bucket nor anything with them that witness saw. Returning from the yard, defendant went direct to the jail room, but Freeman stopped at witness's door and asked witness why she did not go to bed. Witness replied that she was waiting for Deputy Sheriff Crystal, who was to come and go on guard duty. Freeman replied that witness need not wait for Crystal, who, as neither he nor defendant knew him, would not be admitted if he came. Witness replied that they would know Crystal by his crutch. To this Freeman replied that there were crippled men in that town he would not admit to the jail room for twenty-five dollars. Witness then said that she would examine Crystal's papers and identify him in that way. Freeman replied: "It makes no difference; I will not let him in." Witness then said that if Crystal came she would admit him, take her children and occupy the kitchen, and give her room to Crystal. Freeman said no more, but went into the jail room.

A short time later (at about eight o'clock) the witness heard a noise which sounded to her like the working of the lever or brake at the corridor door, which lever was placed to throw the cell locks. A few minutes later, or some time between eight and nine o'clock, the witness (who meanwhile had extinguished her light and was sitting in her room in her stocking feet) heard a noise proceeding from the direction of the jail room, which sounded to her like a pressure being brought to bear on a piece of tin. Witness then walked to the jail room door, the wicket of which was open, and on her way to that door she heard some person who wore "screaking" shoes walk rapidly from the back part of the jail room to the southwest corner of the said room. The jail lamp was burning very dimly. Witness looked through the wicket, but could see nothing. Everything becoming quiet, witness returned to her room, and, though she remained awake throughout the night, with her sick child, she heard no other noise. Witness got up about daylight next morning, went to the wicket and called for the shovel. It was the custom for the guards to keep the shovel in the jail room over night, and pass it to witness on the next morning, filled with coal from the inside jail stove. No answer was made to witness's several calls, until one of the prisoners remarked that the guards were all asleep. About that time Freeman answered from the wooden cell in the northwest corner of the room, and witness observed Witcher lying on a mattress near by, under the west of the south windows. The witness then went into the kitchen, prepared her stove and wood for making her fire, and went back and found the shovel in the wicket. The corridor door was closed. Witness then went back to the kitchen and proceeded with the preparation of breakfast. While she was thus employed, Freeman came into the kitchen, took a seat on a small bed, and remarked to witness: "Well, they got away with us last night." Witness asked: "How?" He replied: "They took Ben away from us last night." Witness, in reply, said: "I know better; that's not so." Freeman replied: "Yes; they came, chloroformed us, and took Ben away, and Bart Witcher is in there now, almost dead." Witness then remarked that she would go in and see if the statements were true, when Freeman remarked: "That will do no good."

Witness told Freeman to open the jail room door, which he hesitated to do, and witness told him that she would go into the jail if she had to break down the door. He then opened the door

and witness went in and found Witcher lying on the mattress where she first saw him. He was apparently asleep, his shoes were off and lying by the mattress, and his coat and vest were hanging on a small stand. Witness then called to her little son to go at once to town and give the alarm, and directed him, if he could find a doctor who had not visited Paschall before his escape, to bring him to see if Witcher had really been chloroformed. When the boy started, Freeman remarked: "It is no use; Ben is gone, and it will do no good!" Witness directed her boy to go, and when he reached the gate, Freeman seized it, and witness told the boy to climb the fence and go. Freeman then said that he would go himself, and passed through the gate and went off.

Up to this time the witness had seen nothing of defendant since the night before. She turned from the gate and went to where Witcher was lying on the mattress, and examined his shoes and pockets for the jail keys, but failed to find them. She then got her smoke house lock and was locking the corridor door, when she heard a voice behind her. She then turned and saw Braz Henry standing in the jail room door, and defendant standing in the door of the wooden cell marked "A" on the plat. She then locked the corridor door and looked at the south of the east window of the jail room, and saw that the piece of tin described by the previous witnesses was off the broken pane, and hanging from one nail. The glass shutters were open and the outside bars were down at one end. A short while afterwards, defendant came to witness with a small blue handkerchief in his hand, and said to her: "Here is what was over mine and Freeman's faces when we woke up this morning." He threw it down and one of witness's children picked it up and handed it to witness. Witness examined it and said: "It is wet with cistern water; there is no chloroform on it." Doctor Herbert, the jail physician, arrived about this time, and it was the recollection of the witness that Freeman came with him. The doctor had the mattress, with Witcher on it, moved from the jail room to the hall. He then got down by Witcher's mattress and asked Witcher if he had drunk any spirits or wine during the night; to which question Witcher replied, "no." Within a short time Witcher sat up and drank a cup of coffee, and soon after that left his bed and walked about the jail.

About this time the witness told Freeman, defendant and Witcher that, as they had accomplished their plan of releasing

Paschall, she wanted them to leave the jail.   Freeman said that
if witness would get his overcoat for him he would go.   The
three parties then left together, but the defendant and Witcher
soon returned, and said that they had been employed by the
county, and that they would not leave until discharged by the
county.   They then took seats in the front yard, and sat there
until arrested by the town marshal.   Mr. Huffman came to the
jail about nine o'clock, when witness gave him such keys as she
had, and he remained until the sheriff returned.   Witness did
not know whether or not the defendant heard or saw anything
that transpired between her and Freeman.   Witness first saw
him, after the escape of Paschall, when he was standing in the
door of the wooden cell marked "A" on the plat, and that was
immediately after Freeman started to town, ostensibly to give
the alarm and summon a doctor.   The testimony of this witness,
so far as it relates to what transpired between herself and Free-
man, is the subject matter of the third and fourth head notes of
this report.

On her cross examination, this witness stated that she had
never heard it stated by any person that her husband was ac-
cused of complicity in the procurement of Paschall's escape.
Her said husband was a candidate for re-election to the office of
sheriff of Denton county at the last election, and was defeated,
but witness never heard him impute his defeat to charges of com-
plicity in the escape of Paschall.   She had never heard him say
that he would spend his farm, if need be, in sending the guards
to the penitentiary.   Witness had testified on two former trials
of this cause—that is, on the trials of Freeman and Witcher for
this offense—and she was satisfied that she testified on each of
those trials, as on this, that Doctor Herbert, when he reached
the jail, asked Witcher if he had drunk any spirits or wine dur-
ing the night.   Defendant was not present at the conversation
between Freeman and witness, in witness's room.   She could
not say that he did or did not hear the other conversations.   The
witness had heard that her husband was suspected of complicity
in the escape of Paschall.

R. C. Scripture testified, for the State, that he went to the
jail between eight and nine o'clock on the morning after the es-
cape of Paschall.   When he got there Witcher was lying on a
mattress in the hall.   He heard Freeman say to somebody, who
was laughing about Witcher being chloroformed, that Witcher
had been chloroformed, and that he, Freeman, went after Doc-

tor Herbert. Witness examined the east window. The south ends of the two outside iron bars were down, the glass shutters were open, and the tin was off. Defendant and Witcher were arrested and taken off while witness was at the jail.

W. J. Lacey testified, for the State, that he was a blacksmith, and that sometime before Christmas, 1884, he was called upon to repair one of the blinds of the south window on the east side of the jail. He repaired that blind by placing three iron bars, about four inches apart, across the blind. He fastened the said bars by running bolts through each end to the inside of the wall. He then screwed taps on the ends of the bolts, and bradded the bolts so that the taps could not be easily taken off. Those taps could not have been removed from the bolts by a person on the outside of the jail room. Ex-Sheriff McDonald joined the Masonic order a short time after the arrest of Paschall, and asked witness about being lectured and instructed. Witness told him that Ben Paschall was the best lecturer in the lodge, and was the Mason most accustomed to that work, and advised him to apply to Paschall, if he could secure the necessary secrecy about the jail.

W. G. Wilson testified, for the State, that he was a member of the grand jury of Denton county, which was reconvened shortly after the escape of Paschall to investigate the said escape. The grand jury examined the jail. The piece of tin described by previous witnesses was experimented with by the grand jury. It was tacked up over the broken pane with small nails only driven partially up, except one, which was driven entirely up. Witness remained on the inside. Mr. D. R. Long went outside and pushed the tin loose at three corners, and it fell with a noise great enough to have been heard some distance. Mr. Long then thrust one hand holding a wrench through a space between the bars, and after several attempts succeeded in grasping one of the taps with the wrench. With another wrench in the other hand, he finally succeeded in removing the taps by turning the bolt. Paschall sold his bank stock a few days before his escape for three thousand dollars, and at the time of his escape he was worth ten or fifteen thousand dollars. Defendant was brought before the grand jury, and, after being warned that he could not be required to make a statement, and that if he did make one it might be used against him, he stated, in substance, that he and Freeman watched until about twelve o'clock, when they waked Witcher, who went on duty,

and they went to bed in the "A" cell; that Paschall was then in his cell; that he, witness, went to sleep and did not awaken until he heard Mrs. McDonald calling for the shovel on the next morning; that he then heard Witcher walking across the floor and supposed he was taking the shovel to Mrs. McDonald; that when he awakened on that morning he found a saturated handkerchief over his face which smelt of chloroform and produced a queer feeling; that Freeman then said that Witcher had been chloroformed, and went after Doctor Herbert, and that he then got up and found the east window open and Paschall gone.

D. R. Long, the next witness for the State, testified substantially as did the witness Wilson, and explained that he managed to remove the tap from the bolt in the manner described by Wilson only with great trouble, and that the tap removed by him was not bradded, and required but little force to remove. The only position in which he could place his body to get hold of the tap with the wrench was such as to render it impossible for him to use much force. He was unable to say whether or not he could have removed the tap if it had been bradded.

Deputy Sheriff Crystal testified, for the State, that McDonald asked him to stay at the jail on the night of Paschall's escape. Witness promised to do so, explaining that he had first to take his aunt home, twelve miles in the country, and would not reach the jail until late. He, however, did not return to the jail, as he did not get home with his aunt until dark. McDonald did not ask witness to go to Alvarado after Ball. Witness could not have gone had McDonald asked him to do so.

County Judge Bradley testified, for the State, that when Paschall was placed in jail he directed McDonald to employ three extra guards to watch the jail during Paschall's confinement, and McDonald accordingly employed Freeman, Witcher and Kelso, and subsequently the defendant.

Cross examined, the witness said that, for some time after the arrest of Paschall, Sheriff McDonald appeared apprehensive, and often expressed fears that Paschall would be released from jail, and asked assignment of more guards. Witness declined upon the ground that three guards and the jailer were enough. A few days before Paschall's escape, McDonald remarked to witness that he then had no apprehension of an attempt to rescue Paschall, and that he did not think Paschall would leave, but would stay and stand his trial if released. In the same connection he remarked that his jailer had quit. Witness replied that

he should not have permitted his jailer to quit. McDonald replied that this was a free country and a man could quit work at will. Witness then directed McDonald to employ another jailer at once.

Tom Lester testified, for the State, that he was the jailer of the Denton county jail when Paschall was first confined therein. Freeman, Witcher and Kelso were the guards at that time. Witness and McDonald nailed a large piece of tin over the broken pane in the east window of the jail room. A nail was driven through each corner of the tin into the sash. During the witness's service as jailer he frequently saw the three brothers and many friends of Paschall in the jail. All of those parties were admitted to confer with Paschall, and Paschall, by order of the sheriff, was permitted to have as much whisky as he wanted. On one occasion witness saw Freeman and Perry Paschall, brother of Ben Paschall, in close conversation near the gate. He did not hear what was said by either party, nor did he think anything of the incident at the time.

Doctor W. C. York testified, for the State, that he was familiar with the properties of chloroform, its uses and modes of administration. To apply chloroform to the nostrils of a sleeping man would obstruct the breathing, and would tend to awaken the sleeper. Basing his opinion upon his familiarity with the properties and effects of chloroform, the witness was satisfied that an adult person, sleeping in a room twenty by twenty-four feet in size, could not be placed under the influence of chloroform without being awakened. The effects of chloroform are transitory, and disappear in an hour or two. A handkerchief saturated with chloroform, if spread on the face of a sleeper, would not only awaken him, but would blister the skin wherever the chloroform touched it. As chloroform evaporates very rapidly, a handkerchief saturated with it would dry in a very short while. The medical books report but three instances of sleeping persons being placed under the influence of chloroform without being awakened. In each of those cases, one being a child, the chloroform was administered through a machine made for the express purpose, and manipulated by experts, who acted with the utmost care. A person could take enough laudanum or morphine in an ordinary drink of whisky, without tasting it, to put him under the influence of the drug to that extent it would be difficult to awaken him. A person placed under the influence of a narcotic of any kind, to the point of sleeping soundly,

but who from any cause became sufficiently aroused to understand what was said or done about him, would not relapse under such influence to such extent that he would not be aroused again by the same cause. The influence of the narcotic would decrease as the person exerted himself. Enough laudanum or morphine can be taken in whisky to produce seven or eight hours of continuous sleep.

The State rested.

Judge F. E. Piner was the first witness for the defense. He testified that he was the judge of the judicial district which included Denton county. He remembered the escape of B. F. Paschall from the Denton county jail. The witness had a talk with A. E. Freeman on the south side of the public square on the evening of February 3, 1885. Freeman told witness that Sheriff McDonald was going off that night, and that he wanted witness to furnish more jail guards than he had; that he suspected the sheriff, and did not like his actions about Paschall, that the sheriff had told him that a deputy named Silas Crystal would help guard the jail, and that he, Freeman, did not know Crystal. Witness told Freeman that his, witness's, three little boys could hold the prisoner, and that the three guards on duty were amply sufficient for the purpose; that if he, witness, were in his, Freeman's place, and suspected the sheriff he would not admit the sheriff to the jail after night, and that if he was not satisfied about the deputy Crystal, he would not admit him.

On his cross examination the witness said that he told Sheriff McDonald on that evening that he must have Jim Ball in court when Paschall's case was called for trial. McDonald replied that he had no deputies to send for Ball, and would have to go himself. Witness told him in reply that he must have Ball in court when Paschall's case was called. On re-direct examination the witness said that he presided at the trials of other defendants in this case, and heard Mrs. McDonald testify. She did not testify on either of those trials that she heard Doctor Herbert (now deceased), when he reached Witcher on the morning after the escape of Paschall, ask Witcher if he had drunk any whisky or wine on the night before.

County Judge Bradley, of Denton county, and County Attorney Carswell, of Wise county, testified as did Judge Piner about the testimony of Mrs. McDonald on former trials of this case. Carswell stated, however, that at a more recent conference with the State's witness, after he had discovered the purpose

of the defense to advance the theory that Witcher was drugged by the use of whisky, he asked Mrs. McDonald about the matter, and she made to him the statement to which she testified on this trial—that is, that Doctor Herbert asked Witcher if he had drunk any whisky or wine during the night, and that he replied that he had not.

J. W. Gober testified, for the defense, that he was a member of the grand jury of Denton county which examined into Paschall's escape from the jail of that county. When the grand jury went into the jail, the witness had the sheriff to show him how he worked the lever at the corridor door to throw the locks and open the cells, his purpose being to determine whether or not the lever could be thrown and the cells unlocked without making a noise. After experimenting a while the witness succeeded in throwing the lever and unlocking the cell doors without making the least noise, and demonstrated that it was entirely practicable for it to be done.

W. H. Bates testified, for the defense, that he was the jailer of Denton county from 1872 until 1880, during which time he had a large number of men under him as guards. It was his experience that the guards, when they did go to sleep, slept unusually sound and were much harder to arouse than other men under other conditions. He could give no explanation of this fact, but attributed it partially to the close, damp air common to jails. Prisoners had broken jail and escaped from witness while he was asleep without arousing him.

W. S. Parker testified, for the defense, that he lived about one hundred yards south of the jail in Denton, Texas. About dusk on the evening of February 3, 1885, the witness saw Joe Geddins go over the jail yard fence in the rear of the jail. At about nine o'clock, while passing from his house to his water closet, he heard a noise at the jail which sounded like the falling of a large piece of tin roofing. Witness was in the jail yard on the next morning and saw the east window of the jail house. The south ends of the outside iron bars were down. Witness says: "I believe I could have taken a crow bar, and by pressing against one end of these bars, and pressing it out so as to make the tap on the inside press hard against the wall, and then take a wrench, and put it on the head of the bolt on the outside and turn it, I could take the bolts out. I never tried it, but it seems like I could have done it by standing on the outside. The heads of the bolts, of course, would scratch against the bars and leave

marks very plainly if they had been taken off that way. The taps on the inside would press against the wall and cut into it, and leave signs on the bricks of the wall. I did not examine the window nor anything about it closely, but I saw where parties left the window and climbed over the back fence, where I saw Geddins get over the evening before. On the outside of the fence where they got over, I found the note which is in evidence."

Said note read as follows:

"Bart—If you have got the keys let me know it, and I will go and get the renches and come back. Let me know at once."

On the back of this note appears the following:

"DENTON, Texas, Dec. 1, 1884.
Mr. J. Z. Gedding.     Bought of Fought & Bros., Druggists.
Nov. 5, 1884.   R.        50   Paid Fought & Bro.      R. S. T."

Bart Witcher testified, for the defense, that he was one of the guards associated with defendant when Paschall escaped from the Denton county jail, on February 3, 1885. The witness had the jail keys on that night, and had carried them for some days. Witness slept from dark until twelve o'clock on that night, when he was awakened by defendant and Freeman, and went on watch, Freeman and defendant going to bed in the "A" cell. Soon after witness went on watch Paschall came out of his cell and sat in the corridor and smoked. After a while he offered his bottle of whisky to witness, and witness took two moderate drinks. The witness walked about the jail, read a little, and otherwise employed himself, until about two o'clock he dropped off asleep. His next recollection was of waking up on a mattress in the hall, about nine o'clock on the next morning. He did not know when Paschall got out of jail, but it must have been after two o'clock. Witness hung his keys up under his hat when he lay down. He did not unlock the corridor door, nor did he take, nor aid in taking, the piece of tin from the window, nor did he in any way aid in the escape of Paschall. Witness was asleep, and had not the faintest idea when or how Paschall escaped. He had no recollection of hearing Mrs. McDonald call him on the next morning and ask for the shovel. He had no recollection of placing the shovel in the wicket. The witness went before the grand jury and testified

shortly after the escape of Paschall.   He had no recollection of testifying before the grand jury that, when he went on guard at midnight, Paschall was in his cell, with the cell door closed. He did not remember telling the grand jury that he heard Mrs. McDonald call for the shovel next morning, and that he got up and put it in wicket.   He did not remember telling the grand jury that he got the keys from defendant when he went on guard, nor did he remember whether he did or did not tell the grand jury that Paschall gave him a drink of whisky that night. Witness felt sick and drowsy on the next morning, and could eat nothing.   He recognized and admitted his affidavit attached to Freeman's motion for a new trial.

The defense rested.

Robert Huffman, recalled by the State, testified, in rebuttal, that when he put the bars back on the east window he did not observe that the wall on the inside where the taps rested was in the least injured or marked as if the taps had been pressed against it.

W. J. Lacey testified, for the State, that no man could have removed the bar bolts in the manner described by the witness Parker without drawing the taps entirely through the wall, which was thick but quite loose and rotten.

D. R. Long testified, for the State, that he heard Witcher's statement before the grand jury.   Witcher stated that when he went on watch he got the jail keys from the defendant and placed them under his hat; that he supposed Paschall was then in his cell, as his cell door was closed; that he went to sleep about two o'clock and did not know when Paschall escaped; that he got up next morning and put the shovel in the wicket; that he then laid down, as his eyes hurt him, and that he remembered nothing afterwards until he awakened on the mattress in the hall.   Witness observed no marks on the bars which indicated that the bolts had been turned by an outside pressure.

The State next placed in evidence the affidavit of Witcher filed to support the motion for new trial in Freeman's case.   It states, among other things, that when the affiant went on watch Paschall was in the corridor and that the corridor door was closed; that he then observed nothing unusual about the appearance of the jail room or cells; that he then had all of the jail keys and had had them all night; that soon after he went on watch Paschall gave him a drink of whisky, and that, growing very sleepy, he went to sleep within an hour, on a pallet near the

stove; that he knew nothing more until next morning, when he was awakened and placed the shovel in the wicket; that he was then stricken with a dizzy sensation and laid down again, and immediately became powerless; that the next thing he remembered he was being taken into the hall on the mattress; that a short time thereafter he was aroused, and at the solicitation of Mrs. McDonald he took a cup of coffee, which, however, he did not want; that Paschall was daily supplied with whisky by the consent of the sheriff, and it was a common occurrence for the guards to drink with said Paschall on his invitation; that there never was an understanding between the affiant and Freeman to permit the escape of Paschall, nor was there ever a conversation looking to such escape between witness and Freeman or anybody else; that affiant did not hear the corridor door open, nor the tin fall, on the night of Paschall's escape.

The State closed.

Bart Witcher, recalled by the defense, testified that his previous testimony given in this case was false and totally untrue. As a matter of fact, he did unlock the corridor door and let Paschall out. He also removed the tin from the broken pane of the window, but he did not remove the taps from the bolts which secured the outside bars, nor did he assist in doing so. Witness admitted that, before being placed on the stand to deliver his testimony in this case, he had a conversation with Messrs. Smith and Patterson, the attorneys for the defendant, and he told them in that conversation that he unlocked the corridor door and let Paschall out, and that he removed the tin, but he did not tell them that he unscrewed the taps with a wrench while Joe Giddens with another wrench held the head of the bolts on the outside.

E. C. Smith testified, for the defense, that he and J. W. Patterson were counsel for defendant. During adjournment of the court for dinner, on the day prior to this testimony, witness and Patterson had a conversation with Bart Witcher in the presence of Perry Paschall. Witness and Patterson reminded Witcher that he had been acquitted of this offense, and asked him to tell all he knew about it, as he could not be tried again. Witcher then said that he opened the corridor door so that Paschall could pass out, and that he also removed the piece of tin from the window. He said that he then took a wrench and unscrewed the taps from the bolts while Joe Giddens held the bolt heads on the outside with another.

The motion for new trial raised the questions discussed in the opinion.

*James H. Burts,* for the appellant.

*W. L. Davidson,* Assistant Attorney General, for the State.

Willson, Judge.    I.    When a defendant is dissatisfied with the charge of the court, and desires to except thereto, he must state to the court at the time the charge is given to the jury that he excepts thereto; but he is not required to specify his exceptions until the jury has retired from the box. But, before the verdict is returned, he must specify his exceptions, in order that the court may correct the charge if, in the opinion of the court, it is erroneous or insufficient. (McCall v. The State, 14 Texas Ct. App., 353; Phillips v. The State, 19 Texas Ct. App., 158.)

In this case the bills of exception to the charge of the court were not reserved in the manner required. After the jury had retired from the box, counsel for defendant stated to the court that he desired to except to the charge of the court. Thereupon the court asked the counsel to state the grounds of exception; that the court was ready to supply any omission, or correct any error which might be in the charge, if pointed out. Counsel did not comply with this request of the court, and did not specify exceptions to the charge until after the return of the verdict. We are not, therefore, called upon to consider the exceptions to the charge, and decline to do so, there being no fundamental error pointed out, or perceived by us, in the charge.

II.    In so far as the special charges requested by the defendant, and refused by the court, are correct in principle, and demanded by the evidence, they were substantially and sufficiently embodied in the charge given to the jury, and no error was committed in refusing them.

III.    On the trial, over the objections of the defendant, the State was permitted to prove the acts and declarations of one Freeman occurring both before and after the escape of Paschall from the jail, and when the defendant was not present. These acts and declarations were in relation to said escape, and tended strongly to prove that Paschall had been wilfully permitted to escape from jail by the guards. There can be no question but that this testimony was calculated to injure the rights of the de-

fendant, and if it was improperly admitted the error is material, and the conviction must be set aside.

We are of the opinion that said testimony was inadmissible. There was no sufficient proof of the existence of a conspiracy between Freeman and the defendant to permit Paschall to escape, to warrant the admission in evidence of the acts and declarations of Freeman performed and made when the defendant was not present. It is still clearer that the acts and declarations of Freeman performed and made *after* the escape of Paschall, and not in the presence of the defendant, were not admissible evidence against the defendant. Such testimony would not have been legitimate, even if the proof had established a conspiracy between Freeman and the defendant to permit the escape of Paschall. (Phillips v. The State, 6 Texas Ct. App., 383; Willey v. The State, 22 Texas Ct. App., 408; Cortez v. The State, 24 Texas Ct. App., 511.)

Because of the error committed in admitting the testimony objected to, proving acts and declarations of Freeman, the judgment is reversed and the cause is remanded.